

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:RTP/MAA/ADR                    *271 Cadman Plaza East*
F. #2017R00137                     *Brooklyn, New York 11201*


July 16, 2024

By ECF

The Honorable Gary R. Brown
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:   United States v. Lianbo Wang
            Criminal Docket No. 22-484 (GRB)

Dear Judge Brown:

        The government respectfully submits this sentencing memorandum in advance of the defendant Lianbo Wang's sentencing hearing, which is currently scheduled for July 23, 2024 at 11:30 a.m, and in response to the sentencing memorandum filed by the defendant on July 11, 2024.  For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the advisory United States Sentencing Guidelines ("Guidelines") range of 78 to 97 months' imprisonment.  Such a sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

I.      Background

        The defendant's conduct is detailed in the Probation Department's ("Probation's") Presentence Investigation Report, dated May 29, 2024 ("PSR").  In brief, the defendant and his codefendant Sherry Li, along with others, executed a scheme to defraud investors in a fictitious development project called the Thompson Education Center ("TEC") (the "TEC Project") out of more than $30 million.  Many of the victims were foreign nationals located in the People's Republic of China ("PRC") who were persuaded to invest in the project by the defendants' false assurances that their $500,000 investments would guarantee them lawful permanent residence in the United States through the EB-5 investment visa program.  In carrying out the scheme, the defendants falsely represented the progress they were making on the project and its support from government officials.  The defendants distributed promotional materials that contained photographs of Li with prominent U.S. politicians in an effort to falsely convey government support for the project.

        In furtherance of the scheme, Li and Wang also acted as "straw donors" for foreign nationals to unlawfully contribute to campaigns supporting U.S. politicians and political

committees, including in connection with a June 28, 2017 fundraising event (the "June 2017 Fundraiser") for the then-President of the United States. Li and Wang used a photograph from the event to solicit additional investments in the fraudulent project. Li and Wang contributed millions of dollars to federal, state and local campaigns, including more than $600,000 ($329,500 from Wang) to the joint committee hosting the June 2017 Fundraiser, consisting entirely of funds from donors in the PRC for whom Li and Wang acted as straw donors. At the time they made these contributions, they were the largest contributors to the joint fundraising committee.

    A.    <u>Relevant Regulatory Background</u>

<em>The EB-5 Program</em>

The EB-5 Visa Program (the "EB-5 Program") was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors. Under the program, which is administered by the United States Citizenship and Immigration Services ("USCIS"), foreign nationals are eligible to petition USCIS to become lawful permanent residents of the United States when they show they have (a) invested $500,000 in a high unemployment or rural area (or $1 million in any area), (b) in a new commercial enterprise, (c) that carries a risk of loss and (d) creates at least 10 full-time jobs for U.S. workers. (PSR ¶ 7.)

Projects seeking to solicit EB-5 Program investors often promote not only the potential financial return, but also the path which the EB-5 Program provides for such investors to obtain the prospective immigration benefit of lawful permanent resident status. Individuals or entities seeking to solicit EB-5 Program investors are prohibited from guaranteeing, whether explicitly or implicitly, that investors will be granted lawful permanent resident status. Further, investors' capital must remain "at risk" throughout the duration of the project for the investors to be eligible for any immigration benefit. To the extent that the investor is promised and/or guaranteed a return on their investment, it would not fall within the scope of the EB-5 Program and the investor would not be eligible for any immigration benefit. (Id.)

After making the $500,000 investment, the foreign investor may petition USCIS for a conditional lawful permanent resident status (often referred to as a "temporary green card"), which is valid for two years. As part of the initial petition for a temporary green card, the investor submits an EB-5 economic report that outlines how many jobs the investment is projected to create and whether those jobs are direct or indirect. The primary mechanism for an EB-5 investor to apply to USCIS for a temporary green card through the EB-5 investment process is the I-526 Immigrant Petition by Alien Entrepreneur form, through which the investor demonstrates that he/she is in the process of investing or has already invested the requisite amount of capital in a suitable EB-5 project. (Id.)

At the end of the two-year conditional period, the EB-5 Program investor may request that USCIS issue a permanent green card. In determining whether to grant the request for a permanent green card, USCIS considers, among other things, whether the actual project costs and/or revenues resulting from the EB-5 investment were sufficient to create the required number of jobs. (Id.)

2

*The Federal Election Campaign Act*

The Federal Election Campaign Act ("FECA") is administered by the Federal Election Commission ("FEC"). (Id. ¶ 8.) Candidates and political committees are required to make periodic reports to the FEC identifying each person who contributes money or anything of value by name, occupation, employer and mailing address. See 11 C.F.R. §§ 100.12, 104.3. Among other things, FECA makes it unlawful for "a foreign national, directly or indirectly, to make a contribution or donation of money or other thing of value, . . . in connection with a Federal, State, or local election," or to make "a contribution or donation to a committee of a political party," and further makes it unlawful for any person to solicit, accept, or receive such a contribution or donation from a foreign national. 52 U.S.C. § 30121(a); see also 11 C.F.R. § 110.20. (PSR ¶ 8.)

FECA also makes it unlawful for a person to "make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution," what is commonly referred to as a "straw" donation, and further provides that "no person shall knowingly accept a contribution made by one person in the name of another person." 52 U.S.C. § 30122; see also 11 C.F.R. § 110.4. FEC regulations provide that "[a]ll contributions by a person . . . to a candidate, including contributions which are in any way earmarked or otherwise directed to the candidate through an intermediary or conduit, are contributions from the person to the candidate." 11 C.F.R. § 110.6(a). (PSR ¶ 8.)

FEC regulations prohibit candidates and political committees from knowingly accepting any contributions in violation of these prohibitions, see 11 C.F.R. § 110.9, and require candidates and committees to use their best efforts to obtain, maintain and submit required contributor-identifying information to the FEC by requesting identifying information from contributors when soliciting contributions, see 11 C.F.R. § 104.7. When contributors make straw donations or otherwise withhold information from candidates and political committees about the identity of the contributors, that affects the ability of candidates and committees to comply with the relevant FEC regulations. (PSR ¶ 8.)

B.    The Fraudulent Investment Scheme

Beginning in or about May 2013, Li and Wang and their co-conspirators solicited investments in the TEC Project from victim investors, including foreign nationals of the PRC desiring to obtain lawful permanent residence in the United States. (Id. ¶¶ 6, 9-11.) Wang held himself out to be the marketing director and general manager of TEC, and Li held herself out to be the president. (Id. ¶ 6.) Li and Wang fraudulently induced investors to contribute capital to the TEC Project and then siphoned off the proceeds of the scheme for their personal benefit through the use of a network of dozens of business entities (the "TEC Entities"). (Id. ¶ 12.) After creating the TEC Entities, Li frequently opened bank accounts in the names of the TEC Entities, which Li, Wang and their co-conspirators used to divert victim-investor funds to pay for personal expenses and to withdraw proceeds of their fraud for personal use. (Id.)

In furtherance of the fraud scheme, Li and Wang and their co-conspirators described the TEC Project to potential investors as a "multi-phase project." (Id. ¶ 10.) The defendants told potential investors that the first phase of the TEC Project would be the

construction of two college classroom buildings, two college student activity centers, a sports center, a community center and six student housing buildings, including 132 units of townhouse-style housing, 200 two-bedroom apartments and 50 three-bedroom apartments. (Id.) Li and Wang and their co-conspirators told potential investors that the total cost of construction of the first phase of the TEC Project was estimated to be $150 million, and that TEC intended to raise $60 million from 120 EB-5 investors and the remaining $90 million from other sources, including debt and equity investors, to fund the construction of the project. (Id.)

   To effect their scheme, Li and Wang and their co-conspirators made materially false and misleading representations to investors and potential investors, to USCIS and to others: (1) that EB-5 investors in the TEC Project were guaranteed to receive a green card in return for their investment; (2) that the TEC Project had received the required construction permits and approvals from local governments to build the project and that the TEC Project was already under construction; (3) that TEC was being audited by a major accounting firm and had agreed to partner with a major investment bank to conduct an initial public offering ("IPO") and that TEC would list its stock on the New York Stock Exchange; (4) that TEC had secured partnership agreements with prominent universities to enroll, educate, and issue diplomas to students; and (5) that the conspirators' ties to high-ranking elected and government officials assured the TEC Project of political support to attain regulatory approvals. (Id. ¶ 11-12.) Examples of some of the many statements made specifically by Wang are detailed in the PSR, ¶¶ 11(a)-(e).

   Based, in part, on these misrepresentations, Li and Wang and their co-conspirators raised more than $30 million from approximately 170 investors in the TEC Project, including $16.5 million raised from EB-5 investors who were promised a green card in return for their investment, and approximately $15 million from stock investors. (Id. ¶ 13.) No EB-5 investor in the TEC Project received a temporary or permanent green card; to the contrary, beginning in or about March 2017, USCIS began issuing notices of intent to deny ("NOIDs") EB-5 investors' petitions for temporary green cards because USCIS did not find TEC's business plan credible. (Id. ¶ 11(a).)

   Li and Wang and their co-conspirators siphoned off the money they fraudulently obtained from investors by transferring the funds through bank accounts held in the names of the TEC Entities and other companies that Li had created. (Id. ¶¶ 12, 15.) Once the funds were in those accounts, Li and Wang used the funds to pay for numerous personal expenses including clothing and accessories, jewelry, housing, vacation travel, upscale dining, and to make political contributions to prominent politicians. (Id.) Wang also used investor funds to pay gym membership fees and to make a payment to his ex-wife. In total, Li and Wang and their co-conspirators spent millions of investor dollars on personal expenses, including hundreds of thousands of dollars that went into personal accounts held by Wang. (Id. ¶ 15.)

  C. <u>The Scheme to Obstruct the FEC's Enforcement of FECA</u>

   As part of their effort to solicit investments by foreign nationals in the TEC Project, Li and Wang orchestrated a scheme to make "straw" donations of foreign money to U.S. politicians and political committees. (Id. ¶ 14.) Li and Wang obstructed the enforcement of FECA by causing those politicians and political committees to inaccurately report to the FEC the true sources of the political contributions they received. (Id.) Li and Wang promised foreign

nationals access to U.S. political events and politicians in exchange for money.  (Id.)  Moreover, in violation of FECA, they used the money they received from foreign nationals to fund political contributions purportedly by U.S. citizens, and falsely identified themselves and other U.S. citizens as the contributors of the funds.  (Id.)  In some cases, Li and Wang used TEC investors' investment funds to make the political contributions which they used to gain access to the political events, where Li and Wang took photographs with elected officials.  (Id.)  Li and Wang used the photographs with elected officials to promote the TEC Project, by, among other things, falsely claiming to prospective investors that the elected officials supported the TEC Project. (Id. ¶ 11(e).)

For example, in or about June 2017, Li contributed $270,500 to a joint fundraising committee (the "Joint Fundraising Committee") comprised of the National Committee and a committee supporting the re-election of the then-President of the United States.  The contribution was made in Li's name.  That same month, Wang contributed $329,500 to the Joint Fundraising Committee.  The contribution was made in Wang's name.  (See Indictment, ECF No. 32 at ¶¶ 24-25.)  Although Li and Wang made the contributions in their own names, the funds to make the contributions did not belong to Li or Wang.  In fact, Li and Wang had solicited the funds to make the contributions from 12 foreign nationals who were not citizens or lawful permanent residents of the United States, including 11 citizens of the PRC.  Li and Wang concealed the fact that the 12 foreign nationals were the true sources of the contributions by making the contributions in their own names.  (Id. ¶ 26.)  The donations were made in connection with the June 2017 Fundraiser described above, which was hosted by the Joint Fundraising Committee. Li and Wang used a photograph from the event to solicit additional investments in the fraudulent TEC Project.

In October 2017, as part of their continued effort to solicit investments by foreign nationals in the TEC Project, Li and Wang continued to violate campaign finance laws.  Among other things, Li, Wang, and others used straw donations in order to illegally contribute foreign-sourced funds to federal and state election campaigns and to provide foreign nationals access to U.S. government officials in exchange for payments from the foreign nationals.  (Id. ¶ 27.)

D.    The Charges and Guilty Plea

On October 24, 2022, a grand jury in this District returned a twelve-count indictment against Wang, Li and their PRC-based co-conspirator Guo Xuefeng (the "Indictment").  Wang was charged with wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. § 1343 (Count Two); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Three); conducting unlawful monetary transactions over $10,000, in violation of 18 U.S.C. § 1957 (Count Four through Count Seven); and conspiracy to defraud the United States and violate FECA, in violation of 18 U.S.C. § 371 (Count Eight).  (See ECF No. 32).  On March 19, 2024, the defendant pled guilty before this Court, pursuant to a plea agreement, to Count Four and Count Eight of the Indictment.  (PSR ¶ 1.)  The Court accepted the plea.

II.    Applicable Law

      The Supreme Court has instructed that a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).

      Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).  Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, a court shall consider:

      (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

      (2) the need for the sentence imposed--

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct; [and]

        (C) to protect the public from further crimes of the defendant.

      Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation.  See 18 U.S.C. § 3553(a)(2)(D).  Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence.  The sentencing court must also "remain cognizant of them throughout the sentencing process."  Gall, 552 U.S. at 50 n.6.

III.    Guidelines Calculation

      The government agrees with Probation's calculation of the defendant's offense level in the PSR (¶¶ 21-32) as set forth below:

Count Four

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. §§ 2S1.1(a)(1); 2B1.1(a)(2)) | | 6 |
| Plus: | Loss more than $25 million (U.S.S.G. § 2B1.1(b)(1)(L)) | +22 |
| Plus: | 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Use of sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Plus: | Convicted under 18 U.S.C. § 1957 (U.S.S.G. § 2S1.1(b)(2)) | +1 |

|  |  | Total: | <u>33</u> |
|---|---|---|---|

<u>Count Eight</u>

|  | Base Offense Level (U.S.S.G. § 2C1.8(a)) | 8 |
|---|---|---|
| Plus: | Illegal transactions more than $550,000 (U.S.S.G. § 2C1.8(b)(1)) | +14 |
| Plus: | Illegal transaction received from foreign national (U.S.S.G. § 2C1.8(b)(2)) | +2 |
|  | Total: | <u>24</u> |

| Total Offense Level (U.S.S.G. § 3D1.2)) | <u>33</u> |
|---|---|
| Less:   Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a) and (b)) | -3 |
| Less:   Zero Point Offender (U.S.S.G. § 4C1.1) | -2 |
| Total | <u>28</u> |

The total offense level is 28, which, based on a Criminal History Category of I (<u>id.</u> ¶ 35), carries an advisory Guidelines range of 78 to 97 months' imprisonment.  The defendant stipulated to this Guidelines calculation in the plea agreement.

IV.    <u>A Guidelines Sentence Is Appropriate</u>

The government respectfully submits that a sentence within the advisory Guidelines range of 78 to 97 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.  The need for such a sentence is underscored by the sentencing factors articulated in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and both specific and general deterrence.

The defendant's criminal conduct was extremely serious and broad in both length and scope.  Together with Li and others, Wang orchestrated a fraud over a period of years that grossed more than $30 million and involved multiple co-conspirators and approximately 170 victims both in the United States and overseas, including in the PRC.  The defendant's scheme required near-constant deception – countless material misrepresentations to investors, potential investors, and the United States government.  To perpetuate their long-running scheme, Li, Wang and their co-conspirators also created and used numerous corporations and bank accounts both in the United States and in the PRC, including corporations and accounts used explicitly to launder and conceal misappropriated funds.  They then used the funds to pay for numerous personal expenses including clothing and accessories, jewelry, housing, vacation travel, upscale dining, and to make political contributions to prominent politicians.

The defendant's conduct was one of greed and not of need.  Wang reported to Probation that his inability to secure lucrative employment was troublesome to his now ex-wife. (<u>Id.</u> ¶ 42.)  The defendant made the decision to acquire the wealth and status he sought through

deception and a disregard for the law. His conduct had a profound effect on his victims, each of whom lost enormous portions of their savings based on his false promises. This is evidenced in the more than a dozen victim impact statements provided to the Court in connection with Wang's sentencing.[1] One victim lost her life's savings, including her daughter's education fund, and cannot afford to pay for her father's lung cancer treatments. Another victim's parents lost their retirement savings and home and had to return to work. That same victim missed a family funeral and best friend's wedding while awaiting the promise of a green card that was never going to come. Scores of additional witnesses lost their savings and suffered other detriments. Meanwhile, the defendant used the victims' money to fund a life of luxury, travel and political hobnobbing.

In doing so, he degraded a fundamental institution in this country—the operation of fair and transparent elections free from improper influences. Wang and his co-conspirators sought to profit by selling access to the democratic process. They promised foreign nationals access to U.S. political events and politicians in exchange for money, and they used the money they received from foreign nationals to fund political contributions that they falsely represented came from U.S. citizens. In some cases, Li and Wang used TEC investors' investment funds to make the political contributions. They used those contributions to gain access to political events and take photographs with elected officials, and they brazenly used those photographs to further promote the TEC Project and falsely claim political support for the project. It was a cycle of shameless greed and deception.

A guidelines sentence is not only necessary to deter the defendant and others from skirting the law to achieve wealth and attention on the backs of victims; it is necessary to send a strong message about the sanctity of elections in our democracy. Congress enacted FECA to prevent undue foreign influence in our federal elections and to limit the influence that any one person could have on a federal election. The defendant's actions circumvented and undermined these ends. A strong sentence is necessary to protect our democratic processes from future abuses and to demonstrate the consequences of interfering, for profit or otherwise, in our country's fundamental institutions.

The defendant's arguments for a downward departure or variance from the sentencing Guidelines are unavailing. First, the defendant points to certain health ailments and conditions at the Metropolitan Detention Center ("MDC"). The defendant should certainly receive medical treatment when needed and by his own admissions he has; the government facilitated communications with MDC staff when asked by counsel and ensured that the Court's order that the defendant receive medical attention was promptly followed.[2] There is no indication that the Bureau of Prisons cannot adequately address the defendant's medical

---

[1]     The government understands that Probation will provide the victim impact statements to the Court and defense counsel under separate cover.

[2]     MDC staff informed the government that, to their knowledge, the defendant did not request to be seen by medical staff through proper channels prior to seeking judicial intervention.

conditions during his incarceration – which is likely to occur at a facility other than MDC – just as it has for countless other inmates.

The defendant also complains generally about conditions at MDC, largely based upon information that is publicly available and seemingly not related to his own experiences. This is not a basis to depart from the Guidelines and impose a lower sentence.  See, e.g., United States v. Thawney, No. 20-CR-428 (WFK), 2022 WL 2132993, at *5 (E.D.N.Y. June 14, 2022) (rejecting request for downward variance based on the defendant's argument that the court should "account for the harsh conditions in which Defendant was incarcerated while in the MDC"); Transcript of Sentencing, Hon. Pamela K. Chen, United States v. Idris Dayo Mustapha, No. 23-CR-440 (E.D.N.Y. May 1, 2024), at 33-34 (noting that the Court is "not going to be convinced by general descriptions of the conditions at the facility or in the BOP system writ large that a variance is warranted for any particular defendant . . . .").

Second, the defendant argues that a downward departure or variance is warranted because his adjusted offense level is tied to the loss amount in this case.  He cites U.S.S.G. § 2B1.1 Application Note 21(C), which provides that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."  The note further states: "For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims.  In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense.  If so, a downward departure may be warranted."  Id. That note contemplates a circumstance not present here:  the losses here were not small or insignificant losses spread across a large, anonymous population of market participants; they were deeply impactful losses borne by real victims, who suffered the devastating economic harms of the scheme in very real ways, as described above.  Contrary to the defendant's suggestion, it is of no relevance that the forfeiture amount is less than the loss amount.  In considering a defendant's culpability, it is appropriate for the Court to consider the losses caused to victims, irrespective of whether those loses are subject to forfeiture by the defendant.

Lastly, the defendant's efforts to minimize his role in the charged conduct by arguing that his co-defendant Sherry Li had a more significant role – which the government does not dispute – are unpersuasive.  The defendant eagerly seized an opportunity to participate in the charged scheme, and played a key role in facilitating the execution of that scheme – all for his own benefit, and to the considerable detriment of the victims.  The defendant often interfaced directly with victims, serving as a conduit of lies and deception to vulnerable would-be investors. As noted above, examples of some of the many statements made specifically by the defendant in furtherance of the scheme are detailed in the PSR, ¶¶ 11(a)-(e).  Tellingly, the victim impact statements speak of conduct by the defendant – not merely by Li.  As he affirmed in his plea allocution, and as demonstrated in the oceans of evidence in this case, the defendant's conduct was knowing, intentional, deliberate and criminal.

V.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 78 to 97 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/_____
Robert Polemeni
Meredith A. Arfa
Andrew D. Reich
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (GRB) (By ECF)
James Roth, Esq. (By ECF and Email)
Emilee Sahli, Esq. (By ECF and Email)
United States Probation Officer (By Email)